# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 3, 2015 Session

## STATE OF TENNESSEE v. BILLY STEWART

**Appeal from the Criminal Court for Shelby County**
**No. 13-01037    Paula Skahan, Judge**

_____

**No.  W2013-02562-CCA-R3-CD  - Filed June 4, 2015**

_____

The Defendant, Billy Stewart, was found guilty by a Shelby County Criminal Court jury of four counts of aggravated cruelty to animals, Class E felonies, and one count of cruelty to animals, a Class A misdemeanor.  *See* T.C.A. §§ 39-14-212, 39-14-202 (2014).  The trial court sentenced the Defendant as a Range I, standard offender to two years for each felony conviction and to eleven months, twenty-nine days for the misdemeanor conviction.  The court ordered partial consecutive sentences, for an effective four years in confinement.  On appeal, he contends that (1) the evidence is insufficient to support his aggravated cruelty to animals convictions, (2) the trial court erroneously admitted evidence at the trial, (3) the State improperly withheld exculpatory evidence, and (4) the trial court erred during sentencing.  Although we affirm the Defendant's convictions, the judgment form for Count 5 erroneously reflects that aggravated cruelty to animals is a Class D felony rather than a Class E felony, and we remand for entry of a corrected judgment for that count.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Case Remanded for Entry of Corrected Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Billy Stewart.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katie Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to an undercover operation conducted at a Shelby County animal shelter. At the trial, Memphis Police Detective Daniel Arrington testified that while he worked in the organized crime unit in 2011, he was assigned to work undercover at the Memphis Animal Shelter. His three-month undercover operation began in November 2011. The purpose of the assignment was to investigate complaints of animal fighting, animal cruelty, and unaccounted for animals. Detective Arrington worked as a temporary animal care technician under an assumed name, and his duties included caring, feeding, and cleaning up after the animals. Occasionally, he was assigned to work with a certified euthanasia technician.

Detective Arrington testified that he worked with the Defendant daily and that he also worked with codefendant Frank Lightfoot, a certified euthanasia technician. Detective Arrington said the Defendant was an animal care technician who was responsible for treating the animals compassionately and feeding and cleaning up after the animals daily. Although the Defendant was not a certified euthanasia technician, he and Detective Arrington transported animals from their cages to the euthanasia room. The shelter had cotton leashes and "catchpoles" to transport dogs.

Detective Arrington testified that stray animals were contained in the "stray room" for a short time. He and the Defendant fed and cleaned up after the animals in the stray room. He said stray animals were euthanized if not adopted within a specified time. He said that if a dog were playful and friendly, he used a leash to transport it to the euthanasia room but that if a dog were aggressive and unfriendly, he used a catchpole. He said that the number of animals euthanized daily ranged between twenty to forty and that out of twenty dogs, approximately five were aggressive enough to warrant the use of a catchpole. The detective was always able to control aggressive dogs during transportation with the use of a catchpole.

Detective Arrington testified that after transporting an animal to the euthanasia room, it was placed in a "squeeze gate" area, which consisted of a fence attached to a wall. The area confined the animal against the wall in order for the euthanasia technician to administer a sedative. After the sedative was administered, the technician administered the euthanasia injection. Detective Arrington stated that if someone were concerned a dog might bite, a mouth guard was used.

Detective Arrington testified that on December 17, 2011, he and the Defendant transported dogs to the euthanasia room and that Kirby Hankins was the euthanasia technician. The Defendant transported a mid-sized Collie dog to the euthanasia room and told the detective, "I'm not going to be able to wrap the dog's mouth. I'm going to have to

choke it out[.]" Detective Arrington said the Defendant tightened the catchpole leash, and the dog "jump[ed] up with his neck." The Defendant held the dog in that position for several minutes, and the dog collapsed to the floor. Detective Arrington saw the dog gasp for air and struggle to breathe. Mr. Hankins walked in the room and administered the euthanasia injection. Detective Arrington stated that he had previously investigated incidents of dogfighting and that he saw no evidence the Collie had been engaged in fighting before arriving at the shelter. He denied seeing the Collie bite anyone while it was in the euthanasia room. He said, though, the Collie did not want to walk or comply with commands.

Detective Arrington testified that it usually took an additional three or four minutes to transport a dog with a catchpole. He did not hear anybody "yell at" the Defendant to choke the Collie and said nobody at the shelter told the Defendant to sedate an animal by choking it. He said the Defendant told him on one occasion, "This is how you do it, Daniel. You got to . . . choke them out." The Defendant showed the detective how to loosen the catchpole, put it around the top of a dog's head, and choke the dog.

Detective Arrington testified that on December 28, 2011, he and the Defendant transported various dogs to the euthanasia room and that codefendant Lightfoot was the euthanasia technician. He said the Defendant transported a Rottweiler to the euthanasia room. The dog showed aggressive behavior, and the detective saw the Defendant maneuver the catchpole around the dog's neck and choke it until it was unconscious. The dog gasped for breath, and the Defendant told codefendant Lightfoot, "Come on. Come and hit this. No one needs to see this." Codefendant Lightfoot administered the euthanasia injection. Detective Arrington stated that although the dog displayed some aggressive behavior, it did not attempt to attack anyone and that no evidence suggested the dog had a previous history of dogfighting. It took several minutes for the Defendant to choke the dog, and the detective said it appeared dead on the floor as it gasped for air.

Detective Arrington testified that on January 4, 2012, he worked with the Defendant and codefendant Lightfoot. He said that the Defendant transported a mid-sized dog into the euthanasia room and that it appeared the Defendant had already choked the dog based on the dog's jumping and moving its head. As the detective watched the dog, he determined the dog was gasping for breath. He said the dog fell to the floor, and its breathing became faint. He said the Defendant told codefendant Lightfoot to "come on and hit it." Codefendant Lightfoot administered the euthanasia injection, but the dog did not die immediately. Detective Arrington said codefendant Lightfoot retracted blood from the dog's heart and injected the blood into its lower abdomen, but the dog remained conscious for a few minutes before dying. He said the Defendant remained in the euthanasia room during the incident and expressed concern someone might walk into the room.

Detective Arrington testified that on February 8, 2012, he worked with the Defendant and codefendant Lightfoot and that the Defendant transported a dog to the euthanasia room around 12:45 p.m. He said the Defendant did not place the dog inside the squeeze gate. The detective was already in the room when the Defendant entered with the dog. He saw that the Defendant was choking the dog, which fell to the floor and lay breathless. The Defendant told codefendant Lightfoot, "Come on, Light, hit this one. Nobody needs to see this." Codefendant Lightfoot administered the euthanasia injection. The detective did not see the dog attempt to bite anyone.

Detective Arrington testified that on February 15, 2012, the Defendant transported a small to mid-sized female Pit Bull terrier into the euthanasia room. He said that although the dog did not display any aggressive behavior, the Defendant choked the dog until it was unconscious and fell to the floor. Codefendant Lightfoot administered the euthanasia injection. The detective described the events as follows:

> [T]he catchpole is just tightened even further, the animal just immediately starts jerking, jerking back and forth, moving its neck and you can see the animal just – his mouth opening like it's trying to find air but can't and it takes just moments for the animal to lay out on the floor.

Detective Arrington testified that it was impossible for a dog to choke itself with a catchpole because the user had to utilize the end piece to tighten the cord at the end of the pole. He said that none of the dogs were pulling away when the Defendant choked them and that the Defendant manually pulled the cord tight around the dogs' necks.

On cross-examination, Detective Arrington testified that the shelter director, the deputy director, and the director of human resources knew of the undercover operation. He worked with technicians other than the Defendant, and he observed one incident of abuse with another employee. He denied, though, the other employee's conduct was similar to the Defendant's conduct.

Detective Arrington testified that he learned the animal shelter's protocols from other employees and that he did not receive any training before he began working. He said that on some occasions, he attempted to redirect the Defendant to use other means to control the dogs but that the Defendant said he had the situation "under control." He denied he was told to allow animals to be treated inhumanely in furtherance of his investigation and said his investigation was terminated early because of the abuse he witnessed. He agreed he watched the Defendant choke the dogs to the floor without intervening.

Detective Arrington testified that video cameras were located throughout the animal shelter, except inside the euthanasia room. He said that he witnessed one dog being choked as the Defendant was bringing the dog into the euthanasia room but that he did not think any of the video cameras were in range. He denied viewing any of the video recordings to determine if any animal cruelty occurred in other areas of the shelter. He said he did not attempt to place clandestine recording devices inside the euthanasia room because other employees were always present.

Detective Arrington testified that he submitted a report on December 13, 2011, which identified no suspects. He said that the Defendant and two codefendants were identified as suspects when the indictments were prepared in February 2012. He said that although only one police report existed, supplemental reports were added based upon his investigation.

Detective Arrington testified that he used the squeeze gate "half of the times" and that after a dog was placed inside the gate, the dog was clenched in a vice to prevent its escape. He said the dogs walked to the gate but wanted to "scurry" away when they realized the "box" was getting smaller. He said that he used the catchpole to hold a dog without choking it when it attempted to flee. He agreed the catchpole had to be tight enough to prevent the dog from removing its head.

Detective Arrington testified that four of the five dogs at issue in this case showed signs of aggression, which he defined as snarling and barking when the dog was given instructions. He denied any dog he escorted to the euthanasia room attempted to bite him. He did not know how the Defendant was trained to use the catchpole but said anyone who observed the Defendant would have seen he treated the animals inhumanely. He observed the Defendant tighten the catchpole enough to cause the dogs to squeal and yelp in pain.

On redirect examination, Detective Arrington testified that although many of the dogs did not want to enter the squeeze gate and growled upon entering, the Defendant's conduct obstructed their airways, which caused the dogs to yelp, cry out, and gasp for breath. He said that the catchpole did not tighten on its own and that it locked after it was tightened.

On recross-examination, Detective Arrington testified that the investigation was initiated by the Department of Parks and Neighborhoods. He denied the Defendant was an identified target of the investigation before he began his undercover work. He agreed codefendant Lightfoot bragged about participating in a dogfighting ring.

Codefendant Frank Lightfoot testified that he worked at the animal shelter from 2006 to 2011 and that he was a certified euthanasia technician. He euthanized the animals at the shelter, while the animal care technician handled the animals. He said the Defendant was

responsible for transporting an animal from its cage to the euthanasia room with a catchpole. He said that after an animal was brought into the euthanasia room, the technician restrained the animal in order for him to insert the fatal medication. He said that his assistance might be required to restrain aggressive dogs. He said certain breeds of dogs were aggressive, which included Pit Bull terriers, Rottweilers, Chows, and some smaller dogs. He usually did not assist a technician unless a problem arose. He recalled holding the squeeze gate closed on one occasion when a large dog showed "wild exertion." He said that once the dog was inside the squeeze gate, the technician continued to control the dog with the catchpole.

Codefendant Lightfoot testified that on December 28, 2011, he worked with the Defendant and Detective Arrington. He said that the Defendant and the detective transported animals to the euthanasia room. He recalled that the Defendant transported a Rottweiler into the euthanasia room and that the dog had an "irate attitude" and was "wild." He denied, though, that the dog bit him or the Defendant. He said the Defendant did not attempt to place the dog inside the squeeze gate. The Defendant "held the catchpole on him at a suspended area until he laid out and told [codefendant Lightfoot] that he was ready for [him] to administer the medicine." Codefendant Lightfoot described how to operate the catchpole, noting that the tension was controlled by the operator and was loosened by a button. He said the Defendant placed the catchpole tight around the dog's neck to the extent that it gagged and gasped for air before falling to the floor. He said that after the dog fell, the Defendant said, "Come on. He's ready to be hit."

Codefendant Lightfoot testified that on January 4, 2012, the Defendant entered the euthanasia room with an animal gasping for air. He said, "Mostly I can't really pinpoint the animal but if the animal [were] aggressive, that's the way [the animal] was brought in." He said employees were not permitted to put their hands on the animals but said the animal in question would bite and was "very snappy." He said that when the Defendant tightened the catchpole, the dog gagged and struggled to remain on its feet. He thought the dog fell to the floor in part because it could not breathe and also because the Defendant controlled the dog with the catchpole. He could not recall if the dog died immediately upon the euthanasia injection but said an animal usually died immediately.

Codefendant Lightfoot testified that although he recalled the Defendant's always saying, "Come on, hit this one," he did not recall the Defendant's saying, "Nobody needs to see this." He agreed he pleaded guilty to four counts of aggravated cruelty to animals. He clarified that at his sentencing hearing, he agreed to the State's recitation of the facts, which included an allegation that the Defendant said, "Come on, hit this one before someone walks in."

Codefendant Lightfoot testified that on February 8, 2012, the Defendant entered the euthanasia room with a mid-sized dog and that the Defendant had the catchpole pulled so tight that the dog gasped for breath. He said the dog fell to the floor, and the Defendant said, "Come on hit this one. Nobody needs to see this."

Codefendant Lightfoot testified that on February 15, 2012, the Defendant entered the euthanasia room with a dog while utilizing the catchpole and that the Defendant had tightened the pole around the dog's neck before entering the room. He said the dog was choking when the Defendant entered the room. He said the Defendant continued to let the dog choke until codefendant Lightfoot administered the euthanasia injection.

Codefendant Lightfoot testified that the catchpole protected the person transporting an animal and that it was impossible for an animal to bite the person transporting it unless the person placed himself in the dog's range. He said there was a difference between holding a dog tight enough to prevent it from escaping and tight enough to cause it to choke and gag.

On cross-examination, codefendant Lightfoot testified that most of his training came from other employees at the shelter and that he had to sign a document affirming he knew how to use the catchpole according to the shelter's specifications. Relative to non-aggressive animals, he said the normal procedure was to wrap an animal's mouth with a leash, grab a leg, and inject the euthanasia medication into a vein. Relative to aggressive animals, he said the proper procedure was to attempt to sedate an animal in order to calm it before administering the euthanasia injection. He said injecting a sedative was not an easy task. He said the best method to sedate an aggressive animal was to hold the animal with the catchpole against a wall, grab a leg, and inject the sedative.

Codefendant Lightfoot testified that the Defendant was not the first employee at the shelter to "bring[] a dog to the ground" in order for the euthanasia injection to be administered. He said that he euthanized approximately forty to 100 dogs per day and that he did not have an independent recollection of the specific animals at issue in this case. He recalled the Rottweiler, though, because it was aggressive.

Codefendant Lightfoot testified that animal shelter policy dictated that only one animal be in the euthanasia room at a time but that the policy was violated routinely. He denied, though, that having multiple dogs inside the room resulted in dog fights. He was responsible for sedating any aggressive dog and said the Defendant was not permitted to touch the equipment and medications inside the euthanasia room. He said that Detective Arrington only handled the non-aggressive dogs and never attempted to help the Defendant with the aggressive dogs.

On redirect examination, codefendant Lightfoot testified that aggressive was a general term and that an animal might have been considered aggressive if it were attempting to bite someone or simply not cooperating with a handler. He said his training did not include choking a dog with a catchpole until it could no longer breathe. He said an animal care technician was permitted to hold a dog against the wall with a catchpole, place a dog inside the squeeze gate, and simply hold a dog. He said the technician determined which method was used. He did not recall administering sedatives to any of the dogs at issue in this case and said he did not need to use a sedative if a dog were lying lifeless on the floor. On recross-examination, codefendant Lightfoot stated that a catchpole did not need to be extremely tight to hold a dog against a wall.

Brandy Jackson, records custodian for Memphis Animal Services, testified that the animal shelter's policy manual was compiled in 2010 and had not been amended at the time of the incidents. She said a copy of the manual was distributed to each employee. The manual's "humane treatment" provision outlined how employees were to treat the various types of animals. She said the Defendant was an employee when the manual was distributed in 2010. She identified a form signed by the Defendant on March 10, 2010, indicating that the Defendant participated in a training seminar on the humane treatment of animals.

Ms. Jackson identified the portion of the policy manual related to the proper use of a catchpole, which depended upon an animal's temperament and aggression level. She read from the manual, which stated,

> It's all in the wrist. Using both hands slip the noose smoothly over the dog's head until the loop is around the animal's neck. Use one hand to pull the release cord to tighten the cable until the loop fits snugly but not too tight. The pole is designed to maneuver the animal so it is important never to use the control pole to choke the animal or force him into submission.

On cross-examination, Ms. Jackson testified that the Defendant's signature was on the form related to the Defendant's participating in a training seminar, but she did not know if the Defendant received any training. She agreed that whether the Defendant received training depended upon whether the Defendant's supervisor required it.

Ms. Jackson identified various shelter euthanasia entry forms and testified that each form showed the certified euthanasia technician who completed the form, an inventory of the animals euthanized daily, a description of each animal, each animal's identification number, and the amount of medication used to euthanize each animal. She said the form also reflected the name of the technician who transported the animal to the euthanasia room. Although the forms required a signature of the euthanasia technician, she agreed the forms

she previously identified were not signed. Relative to December 17, 2011, the form contained four pages, which were signed by Kirby Hankins. The first page showed the Defendant and a technician identified as Willie were present, and the second, third, and fourth pages did not identify anyone. Relative to December 28, 2011, the form showed that Archie Elliott was the euthanasia technician. The Defendant's name did not appear on the form. Relative to January 4, 2012, the first page of the form showed codefendant Lightfoot's and the detective's names, the second and third pages showed the Defendant's, codefendant Lightfoot's, and the detective's names, and the fourth page showed codefendant Lightfoot's and the Defendant's names. Relative to February 8, 2012, the Defendant's, codefendant Lightfoot's, and the detective's names were on each page of the form. Relative to February 15, 2012, the first page of the form showed codefendant Lightfoot's and the detective's names, the second page showed codefendant Lightfoot's, the Defendant's, and the detective's names, and the third page showed Terry Gibson's name.

On redirect examination, Ms. Jackson testified relative to the December 28 form that it was possible Mr. Elliot made a mistake when completing the form and that it usually took a certified technician and an animal care technician to euthanize an animal. On recross-examination, she said that although she had observed the euthanasia process, she was not present during the incidents in this case.

Darrell Hudson testified for the defense that he was an animal control officer for the Memphis Animal Shelter and that he was an animal care technician until 2008 or 2009. He received training relative to cleaning the animal cages and to ensuring the animals had food and water. He denied a policy manual existed in 2008 or 2009.

Mr. Hudson testified that as an animal care technician, he transported animals to the euthanasia room and that he was required to use the catchpole at all times. He said most of the dogs at the shelter were strays, were not "leash trained," and could be aggressive. He said that after a catchpole was placed around a dog's neck, it might "do an alligator move," pull back, and bite the pole. He learned to use the catchpole on the job and said that he did not receive training related to its proper use. He identified a catchpole from his truck and said it was bent from various dogs pulling back after it was placed around the neck. He said most of the dogs were Pit Bull terriers, which were extremely aggressive.

Mr. Hudson testified that in his experience transporting dogs to the euthanasia room, most dogs knew the purpose of the room. He said dogs became scared and went crazy. He said all dogs rolled, jumped, fell, and bit when they entered the room. He said, though, this behavior was not aggressive. He said an aggressive dog did not permit anyone to touch it at any time, growled, bit and snapped, showed its teeth, raised its hair, and feared everything. He said an aggressive dog inside the euthanasia room caused handlers "to have a fight on

[their] hands." He said, though, that most dogs tired themselves after time and that the handler had to allow a dog to exhaust itself. He said that when a dog moved "like an alligator" and twisted, the handler had to release the catchpole to prevent the dog from choking but that the handler could not release too much pressure because the dog might "get up and attack."

Mr. Hudson testified that aggressive dogs "choke[d] themselves out" when they spun and eventually lay on the floor. He identified the animal shelter policy manual but could not recall when it was first published. He said that in 2011 and 2012, he saw three or four dogs in the euthanasia room at once. He knew Detective Arrington worked at the shelter under an assumed name and said he never saw the detective inside the euthanasia room. He said that at the time of the relevant incidents, policy did not prohibit more than one dog inside the euthanasia room. Mr. Hudson attended a training class around the time the policy was changed, which was after the Defendant stopped working at the shelter.

On cross-examination, Mr. Hudson testified that some aggressive dogs choked themselves out after a catchpole was placed around their necks. He dealt mostly with aggressive dogs and said a total of ten dogs during his nine years' employment had "choked themselves out," which he said meant the dogs did an "alligator move." He said that when a dog twisted like an alligator, he had to release some pressure and not tighten the catchpole and that the dog usually calmed down and lay on the ground. He said a dog might get up and attempt to attack again, but he denied choking a dog until it was unconscious. He said that a dog might choke itself by "pulling back" while the catchpole was around its neck but that he never tightened the pole.

Mr. Hudson testified that he never worked with the Defendant inside the shelter but worked with him "in the shed." He said all of the shelter employees were friends and agreed he knew the Defendant before the Defendant began working at the shelter. He met the Defendant through the Defendant's mother in the 1990s and had known the Defendant since the Defendant was age fourteen or fifteen.

Mr. Hudson testified that people might define aggressive behavior differently. He said most of the Pit Bull terriers he encountered "on the street" were aggressive. He agreed nobody was supposed to use a catchpole to choke a dog.

On redirect examination, Mr. Hudson testified that an aggressive dog never changed its behavior after it arrived at the shelter. He said most of the dogs he brought to the shelter were aggressive. He denied any of his supervisors provided him a definition for aggressive behavior and said he simply knew the definition.

Marandia Benton testified that she had been an animal control officer since 2006. She said that at Administrator James Rogers's request, she had shown Detective Arrington how to operate the catchpole the day before her testimony. She said the lesson lasted six or seven minutes, and she did not think the detective knew how to operate the pole before the lesson.

On cross-examination, Ms. Benton testified that she did not know if Detective Arrington knew how to use the catchpole. She denied calling defense counsel after the detective left the shelter and said Mr. Hudson told her that counsel had issued a subpoena for her to testify at the trial. She had known the Defendant since he began working at the shelter. She denied working with Detective Arrington or the Defendant inside the euthanasia room.

The Defendant testified that on October 1, 2007, he began working at the shelter as an animal care technician. He said that on his first day of work, he was assigned to the euthanasia room and that he "bagged up deceased animals." He denied receiving training or a policy manual when he was hired and said he learned from co-workers. He received the first policy manual in 2008 and said the manual was reviewed with then-administrator Ernest Alexander. He said that later, administrator Matthew Pepper revised the manual and that he "signed off on . . . receiving this manual." He admitted he read the revised manual numerous times. He identified the section of the revised manual related to operating the catchpole, and said it was effective at the time of the alleged incidents. He said that the provision related to the catchpole was not included in Mr. Alexander's manual and denied that anyone trained the employees on operating the pole. He said that after his arrest in March 2012, someone from the Humane Society trained the employees relative to operating the pole.

The Defendant testified that his on-the-job training was immediate. He said most of the animals were not cared for properly by their owners, had never had human contact, and were sick. He said most of the dogs received by the shelter included Pit Bull terriers, Chows, Rottweilers, and a few small-breed dogs. He said most of the Pit Bull terriers were euthanized because they were identified as an aggressive breed and noted that these dogs were used by drug dealers and fighting rings and that the city feared potential litigation from a biting incident.

The Defendant testified that he transported animals to the euthanasia room using the catchpole but did not administer the medication. He said friendly dogs who were accustomed to human contact were transported with a leash around the neck. He said a leash was wrapped around the mouth after entering the room. Relative to aggressive dogs, he was usually unable to place a muzzle around their mouths. He transported aggressive dogs with the catchpole and directed the dogs into the squeeze gate. He said the euthanasia technician held the dog against the wall and injected a sedative or the euthanasia medication. He said he did not place the noose portion of the catchpole around a dog's neck too tight, only tight

enough to prevent it from escaping. He said, though, 90% of the dogs fought, flipped, and tossed, which required him to pull those dogs. He said many of the dogs were tired by the time they reached the euthanasia room because they had fought, urinated, and defecated on the way to the room. He said that the euthanasia technician was usually ready with the medication when he entered the room and that he immediately attempted to maneuver the dog into a position for the medication to be administered. He said that if using the squeeze gate were not an option because of a dog's behavior, he attempted to "press them up against the wall [and place the dog's] head away from us so we wouldn't get bit or attacked[.]"

The Defendant testified that he did not pull the cord on the catchpole tight enough to choke a dog to unconsciousness. He said he never abused or choked an animal with the pole. He could not recall any of the dates in the indictment because he and the detective were in the euthanasia room frequently. He admitted he was accused of dogfighting in August 2011 but maintained his innocence. He said that the incident surrounded his taking two dogs to the euthanasia room simultaneously. The Defendant said the female dog bit the male dog. The Defendant called for assistance, and another technician helped separate the dogs. The incident was captured on a webcam, and the Defendant said it looked as though he and the technician were engaged in dogfighting. He said viewers reported the incident. He said the shelter administrator and the police investigated the incident and determined he and the other technician were not engaged in dogfighting. The Defendant was permitted to maintain his employment, but he received threats after the investigation concluded.

The Defendant testified that he, Detective Arrington, and codefendant Lightfoot worked together frequently. The Defendant and the detective each transported dogs to the euthanasia room. The Defendant denied only one animal was inside the euthanasia room at a time and said he had seen five to six animals inside the room. He denied he was trained to have only one animal inside the room and noted the supervisor's pressure to euthanize all the animals on the daily list in addition to the animals added to the list by the veterinarian.

The Defendant testified that he never pulled the cord on the catchpole tight enough to strangle an animal and that none of the animals gasped for air. He said the catchpole had a "cutoff point" that allowed the operator to know when it was too tight. He also denied saying to anyone that he had to choke a dog because he was unable to wrap the dog's mouth. He said the squeeze gate was used to place a dog in a position that allowed the euthanasia technician to administer the medication. He denied having a reason to choke a dog and telling codefendant Lightfoot to administer the euthanasia injection quickly because no one needed to see an animal struggling.

The Defendant testified that during his employment, he went above and beyond his duties by assisting in adoption day, working late to care for the animals, and attempting to find new pet owners. He said he received a commendation for his work and a letter thanking him for the additional assistance he provided after his usual work hours.

The Defendant testified that a meeting was convened after the investigation showed he did not participate in any dogfighting and that the administrator told employees not to wear their uniforms in public because various employees had received threats. He identified his July 1, 2011 performance review report and said the report did not contain any negative comments about his job performance. He denied mistreating any of the animals and said he treated aggressive and non-aggressive animals with compassion and care.

On cross-examination, the Defendant testified that when he accepted a job at the shelter, he knew he would have to work with aggressive, sick, and unwanted animals but that he did not realize the shelter euthanized so many. He denied knowing Mr. Hudson well at the time he applied for his job. Relative to the webcam video recording of the alleged dogfighting incident, he agreed policy limited him to taking only one dog outside at a time but said the two Pit Bull terriers were from the same household and were confined in adjacent kennels. He noted that the dogs had not displayed any aggression and that he took them outside on leashes. He agreed the threats he received afterward were posted on the comments section of a news website.

The Defendant testified that he did not recall if he worked with codefendant Lightfoot on the dates listed in the indictment. He said codefendant Lightfoot's testimony was false relative to the Defendant's choking the dogs, causing them to gasp for air and fall to the floor. He denied it was impossible for a dog to choke itself with a catchpole and said aggressive dogs tossed, turned, flipped, and pulled, which caused choking. He said Detective Arrington misunderstood because the dogs were simply out of breath from flipping and pulling away from him. He identified the policy manual and agreed he signed a form stating he received it in 2008 or 2009. Although he agreed the policy stated that "[n]o animal regardless of species, size or temperament shall be unnecessarily carried or dragged by the neck on a leash or control pole," he denied any demonstration was provided about the proper use of the pole. He agreed the manual prohibited any type of choking with a leash or catchpole but said some of the animals were "so crazy" they choked themselves on a catchpole.

The Defendant testified that he had probably received disciplinary letters during his employment but that they were all "null and void." When questioned about a ten-day suspension, he said the matter was null and void because he did not sign anything. He recalled attending a fact-finding hearing on September 9, 2008, and said that the result of the

hearing was a ten-day suspension. He denied the allegations that he failed to clean the puppy and cat room and that the animals were found in "deplorable conditions." He agreed, though, that at the hearing, he was found to have displayed cruel and inhumane treatment toward animals.

The Defendant testified that he did not recall a fact-finding hearing on December 23, 2008, related to his failure to clean an animal cage properly. Although he denied receiving a ten-day suspension, he agreed the fact-finding letter showed he was suspended. He also admitted that on another occasion, he was disciplined for failing to clean the puppy room, that he was accused of soaking a nine-month-old terrier puppy during the cleaning process, and that the puppy was found shivering. He agreed that the fact-finding committee determined the Defendant's conduct was cruel and against shelter policy and that he was suspended for ten days beginning on January 26, 2009. He said he also received a ten-day suspension beginning on October 6, 2008. The Defendant identified an October 21, 2009 letter related to a fact-finding hearing on October 12, 2009. The incident was related to the Defendant's euthanizing the wrong dog. He said he was not disciplined but was provided oral counseling because it was a mistake.

On redirect examination, the Defendant testified that he was not disciplined for the puppy getting wet because a volunteer was guilty of the infraction. He said the December 18 letter was related to the puppy. He said he only received one suspension, which was related to his failure to clean the puppy and kitten room. He said that although he cleaned the room, he was accused of not cleaning it because the puppies and kittens had shredded the papers in their cages.

Adrian Dest testified that he had worked at Memphis City Animal Services since 2004 and that his current position was animal control officer. In his capacity as a union steward, he represented the Defendant in 2011 relative to the dogfighting allegation. He said the webcam recording was about five seconds and did not show the Defendant was engaged in dogfighting. The Defendant was not disciplined for the incident. Mr. Dest also represented the Defendant relative to the wet-puppy incident. He said the complaint was supposed to have been dismissed after the fact-finding hearing.

Mr. Dest testified that he was not trained relative to the proper use of the catchpole when he began working as a technician in 2004. He said another employee showed him how to use the pole. He said that in 2011, no formal training existed, although employees were instructed not to lift an animal off the ground. He said the shelter began a formal training class on the pole after the Defendant was indicted. He said that in 2011 and 2012, about fifty or more animals were euthanized daily. He said that control officers and technicians defined an aggressive dog as one that attempted to bite someone.

-14-

On cross-examination, Mr. Dest testified that he thought he represented the Defendant two or three times relative to disciplinary matters. He said that before 2009, technicians were not required to remove animals from their cages before cleaning the rooms. When provided a copy of the policy manual, he agreed it stated that the animals were to be removed before cleaning. He agreed the Defendant admitted he sprayed the puppies.

Mr. Dest testified that he had never choked a dog with the catchpole until it was unconscious. He said that he had transported dogs from their cages to the euthanasia room, that many of the dogs choked themselves on the pole, and that many yelped. He said, though, that none of them gagged or became unconscious.

Upon this evidence, the Defendant was convicted of four counts of aggravated cruelty to animals and one count of cruelty to animals. The trial court sentenced the Defendant to an effective four years' confinement. This appeal followed.

I

**Sufficiency of the Evidence**

The Defendant contends that the evidence is insufficient to support his convictions for aggravated cruelty to animals. He does not challenge his misdemeanor conviction. He argues that his conduct did not constitute aggravated cruelty because the dogs were aggressive and fought to avoid entering the euthanasia room. Alternatively, he argues that Detective Arrington's testimony, even if credited by the jury, does not rise to the level of "depraved and sadistic" treatment required by the aggravated cruelty to animals statute. The State argues that the jury rightfully determined that the Defendant's conduct was depraved and sadistic and that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"A person commits aggravated cruelty to animals when, with aggravated cruelty and with no justifiable purpose, the person intentionally kills or intentionally causes serious physical injury to a companion animal," which includes dogs. T.C.A. § 39-14-212(a), (b)(2). For purposes of this statute, aggravated cruelty is defined as "conduct which is done or carried out in a depraved and sadistic manner and which tortures or maims an animal[.]" *Id*. § 39-14-212(b)(1).

This court has previously stated that because the statute does not define depraved or sadistic, appellate courts "consider the ordinary meaning of these words in evaluating the sufficiency of the evidence." *State v. Christopher Lee Barnett*, No. M2009-00756-CCA-R3-CD, 2010 WL 3822880, at *13 (Tenn. Crim. App. May 20, 2010), *perm. app. denied* (Tenn. Nov. 23, 2010); *see* Tenn. Att'y Gen. Op. 08-124 (2008). Depraved means "marked by corruption or evil." *Merriam-Webster's Dictionary*, 10th ed. (1996). Sadistic is a form of sadism, which is defined, in relevant part, as "a delight in cruelty" or "excessive cruelty." *Id*. As a result, the State must prove beyond a reasonable doubt that the defendant intended to cause serious physical injury to a dog by conducting himself in a depraved and sadistic manner that tortured or maimed a dog.

In the light most favorable to the State, the record reflects relative to Count 1 that on December 28, 2011, Detective Arrington observed the Defendant transport a Rottweiler dog to the euthanasia room with the aid of a catchpole. Although the dog displayed some aggressive behavior, Detective Arrington said that the dog did not attempt to attack anyone and that it did not have a history of dogfighting. Detective Arrington observed the Defendant maneuver the catchpole around the dog's neck and choke the dog until it was unconscious. As the dog gasped for air, the Defendant told codefendant Lightfoot, "Come on. Come and hit this. No one needs to see this." Codefendant Lightfoot testified that although the dog was "wild" and had an "irate attitude," the dog did not attempt to bite anyone. He saw the Defendant tighten the catchpole around the dog's neck to the extent that the dog gagged and gasped for breath before falling to the floor.

Relative to Count 2, the record reflects that on January 4, 2012, Detective Arrington and the Defendant transported various animals to the euthanasia room. The detective, who was inside the euthanasia room, observed the Defendant enter the room with a mid-sized dog. The detective concluded that the Defendant had already choked the dog based on its jumping

and head movements. Codefendant Lightfoot also stated that the dog was gasping for breath as the Defendant entered the room with the dog. Codefendant Lightfoot said the dog struggled to remain on its feet, and he and the detective saw the dog fall to the floor, after which the detective said its breathing became faint. The Defendant told codefendant Lightfoot to "come on and hit it" and expressed concern someone might enter the room.

Relative to Count 3, the record reflects that on February 8, 2012, Detective Arrington was inside the euthanasia room when the Defendant entered the room with a dog. The detective and codefendant Lightfoot each saw the Defendant choking the dog with the catchpole as he entered the room. The dog fell to the floor and lay breathless. The Defendant told codefendant Lightfoot, "Come on, Light, hit this one. Nobody needs to see this." The detective did not see the dog attempt to bite anyone.

Relative to Count 5, the record reflects that on February 15, 2012, Detective Arrington observed the Defendant transport a mid-sized Pit Bull terrier to the euthanasia room. Although the dog did not display any aggressive behavior, the Defendant choked the dog with the catchpole until it was unconscious and fell to the floor. The detective said the Defendant tightened the catchpole, and the dog immediately began jerking and moving its neck. The detective noticed that the dog opened its mouth attempting to breathe before the euthanasia shot was administered. Likewise, codefendant Lightfoot said the Defendant continued to allow the dog to choke until he administered the euthanasia injection.

The testimony shows that although the dogs might have displayed some aggressive behavior, the definition of aggression widely varied between the witnesses and included a dog's failure to comply with commands. The evidence shows, though, that none of the dogs attempted to bite anyone and that one dog was not aggressive. We note that codefendant Lightfoot stated that it was impossible for a dog to bite the operator of the catchpole unless the operator placed himself in the dog's range. Likewise, it was impossible for any of the dogs to choke themselves with the catchpole because the operator had to manually tighten the cord at the end of the pole. Detective Arrington testified that none of the dogs were pulling away when the Defendant choked them and that the Defendant manually tightened the cord to the extent that the dogs yelped and cried in pain. This conduct was explicitly prohibited by the animal shelter's policy manual, and the Defendant acknowledged he signed a form stating he received the manual. Codefendant Lightfoot testified that there was a difference between holding a dog tight to prevent its escape and holding a dog tight enough to cause choking and gagging.

We conclude that the evidence is sufficient to support the Defendant's aggravated animal cruelty convictions. Although the Defendant claims his testimony shows that he did not choke the dogs and that they "tired themselves out after fighting," the jury's verdict

reflects that it discredited his testimony. The Defendant cruelly and intentionally choked the animals without cause before they were euthanized. The jury could have found that the cruelty inflicted upon these animals was excessive because the dogs were choked with the catchpole until they cried and yelped in pain, collapsed, and struggled and gasped to breathe. This conduct was unnecessary, as the testimony showed that the Defendant could have utilized the squeeze gate to contain the dogs and to provide the euthanasia technician with an opportunity to administer a sedative. No sedatives were administered to these animals because the Defendant choked them until they collapsed to the floor or were unconscious, at which point a sedative was no longer necessary. It was the province of the jury to determine whether the Defendant's conduct was depraved and sadistic, and the record supports the jury's finding. *See* Tenn. Att'y Gen. Op. 08-124 ("In a criminal prosecution under § 39-14-212, it would be the duty of the fact-finder to determine whether the defendant's actions were carried out in a 'depraved and sadistic' manner."). The Defendant is not entitled to relief on this basis.

## II

### Evidence of Disciplinary Records

The Defendant contends that the trial court erred by permitting the State to present evidence of disciplinary records during his employment at the shelter. He notes that the records were not provided to him before the trial and that none of the individuals involved in the disciplinary hearings testified. He argues the evidence was inadmissible hearsay, was improper character evidence, and violated *Brady v. Maryland*, 373 U.S. 83 (1963). Although the Defendant cites general authority relative to the admission of evidence and character evidence, he fails to explain how the evidence was inadmissible hearsay, improper character evidence, and violated *Brady*. Likewise, he fails to cite to the record and to any legal authority to support his individual arguments. *See* T.R.A.P. 27(a)(7)(A) (stating that the appellant's brief must contain an argument providing "the contentions . . . with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record"); *see also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The issue is waived.

## III

### *Brady* Violation

The Defendant contends that the State violated *Brady* by failing to provide a copy of the video recording of the alleged dogfighting incident and by failing to provide his disciplinary records before the trial. He argues that although he filed a motion for discovery and requested "various information" several times, he did not receive the recording or the disciplinary records until after the trial began, which deprived him of a fair opportunity to investigate the disciplinary matters. He further claims that the defense "may have refrained" from asking certain questions and addressing certain issues had it been aware of the information. The State asks this court to waive the issue because the Defendant has failed to include in the record the discovery requests, disciplinary records, and the webcam recording.

The State correctly notes that the Defendant has failed to prepare an adequate record for this issue. *See* T.R.A.P. 24(b); *see also State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). The record does not include any documents related to the Defendant's discovery requests or the State's reciprocal discovery requests. Likewise, the record does not contain any exhibits presented at the trial, including the disciplinary records presented by the State during the Defendant's cross-examination. Although the webcam recording was discussed during the trial, it was not received as an exhibit, and a copy of the recording was not included in the record for identification purposes. As a result, we are unable to review any of the relevant evidence. The issue is waived.

## IV

### Sentencing

The Defendant contends that the trial court erred by denying alternative sentencing and ordering consecutive sentences, although he had no previous criminal history and an extensive employment history. The State requests that this court waive the issue because the Defendant has failed to present an adequate record.

The State correctly notes that the Defendant has failed to prepare an adequate record for this issue. *See* T.R.A.P. 24(b). The record does not contain the sentencing hearing transcript, which is critical to this court's review of the trial court's sentencing

determinations. The Defendant was placed on notice that the relevant transcript was not included in the appellate record once the State submitted its appellate brief, but the Defendant did not request this court permit him to supplement the record with the sentencing hearing transcript. Furthermore, during the argument, the panel questioned the Defendant's counsel about the absence of the transcript. Counsel stated that he thought the transcript was included in the record and that he would submit a motion to supplement the record if the transcript had been omitted. Counsel has not filed a motion to supplement the record. "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *Miller*, 737 S.W.2d at 558. Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions. However, we notice as a matter of plain error that the judgment form for Count 5 improperly reflects that aggravated cruelty to animals is a Class D felony. The offense is a Class E felony, and as a result, we remand for entry of a corrected judgment for that count. We affirm the judgments of the trial court in all other respects.

_____
ROBERT H. MONTGOMERY, JR., JUDGE